234 F.2d 715
 UNITED STATES of America ex rel. FONG FOO, Relater-Appellant,
v.
Edward J. SHAUGHNESSY, District Director, Immigration and Naturalization Service, United States Department of Justice, Respondent-Appellee.
 Docket 23734.
 United States Court of Appeals Second Circuit.
 July 11, 1955.
 
 Spar, Schlem & Burroughs, New York City, for appellant Fong Foo.
 Paul W. Williams, U. S. Atty., New York City, for appellee Shaughnessy.
 Before FRANK, Circuit Judge.
 FRANK, Circuit Judge.
 
 
 1
 This motion was orally argued before me, in vacation, by counsel for appellant and appellee. Because of the importance of the questions involved, I am setting forth my reasons for granting the motion.
 
 
 2
 Appellant is an alien who last entered the United States by means of a false certificate of identity and under an assumed name. He is therefore admittedly deportable, and an order for his deportation has been duly issued. The Immigration and Naturalization Service requested him to execute documents requisite to deportation to Formosa, but he declined to do so, and instead made application, pursuant to Section 243(h) of the Immigration and Nationality Act, 8 U.S.C.A. § 1253(h), for a stay of deportation on the ground that he would be subjected to physical persecution if deported to the mainland of China. Pursuant to this request, a Deportation and Parole Officer held a hearing, at which appellant testified. He was represented by counsel at this hearing. Appellant there testified that he had been a member, since 1928, of the Hok Shan Association, which has collected funds to aid the Nationalist Government of China, and that he has contributed funds for this purpose on several occasions. He stated that he always has been a supporter of the Nationalist Government, that he is an anti-Communist, and that he has expressed his views to fellow-members of the Association. He also testified that he owned land in China, and that he believes his land has been confiscated.
 
 
 3
 The Deportation and Parole Officer summarized the testimony and submitted the summary, without recommendations, to the Acting Chief of the Detention, Deportation and Parole Branch of the Service. Several weeks later, an Acting Assistant Commissioner to whom the Attorney General's authority to stay deportation had been delegated, issued the following, labelled an Office Memorandum:
 
 
 4
 "Attention: Chief, Detention, Deportation and Parole Branch:
 
 
 5
 "After careful consideration of the material the alien has submitted and of his own testimony in support of his claim that he would be subject to physical persecution if deported to China, it is not my opinion that this alien would be subject to physical persecution if deported to that country.
 
 
 6
 "You should proceed, therefore, to execute the outstanding warrant of deportation in this case."
 
 
 7
 The Acting District Director for the New York Area then informed appellant that the Service would execute the deportation warrant, previously issued, "as soon as is practicable". As a consequence, unless judicial relief is granted, appellant will be deported to the Chinese mainland.
 
 
 8
 Fong Foo petitioned for a writ of habeas corpus in the court below. Judge Ryan withheld decision, pending the decision of this court in United States ex rel. Moon v. Shaughnessy, 2 Cir., 218 F. 2d 316, and, after the decision in that case adverse to Moon, Judge Ryan denied the petition but withheld entry of the order for 90 days to afford petitioner a further opportunity to arrange for deportation to Formosa or other territory. He also stated, "I regret that I am without power to afford the petitioner a greater measure of relief." Subsequently, appellant filed another petition in the court below for a habeas corpus writ. From an order, entered by Judge Edelstein, denying relief, Fong Foo has appealed. Pending a hearing by this court of that appeal, he moves for a stay of deportation, for bail, and for permission to proceed in the appeal on typewritten briefs and the original administrative record.
 
 
 9
 1. On a motion to stay deportation pending decision of the appeal, the stay should be granted if there is any substantial legal question affecting the correctness of the judgment below. Of course, a determination that such a substantial question exists is not a decision in favor of appellant; decision on the merits will be made, one way or other, when the appeal is heard.
 
 
 10
 2. The government argues that the Moon case, 2 Cir., 218 F.2d 316, 317, is on all fours with this case and that, therefore, this appeal has no possible merit. But, since life and liberty are here at stake, this court may reconsider its previous decision in the Moon case, if it now appears that there we overlooked any significant factor.
 
 
 11
 I think that, in Moon's case, we did overlook this significant factor: The Attorney General, by his subordinate, found as a fact that appellant would not be "subject to physical persecution" by the Chinese Communist Government. I think we can and should take judicial notice of the notorious and virtually indisputable fact — almost uniformly reported in all pertinent accounts — of the ruthless behavior of the Communist governments in China and Russia, so that almost surely a Chinese, known to have allied himself with the Formosa Government, will be tortured and exterminated if found on the mainland of China.[1] Illegal entry into this country should not be punished by death.[2]
 
 
 12
 The Supreme Court has taken judicial notice of the date when the yachting season ends in our northern waters. See The Conqueror, 166 U.S. 110, 134, 17 S. Ct. 510, 41 L.Ed. 937. Surely the cruel habits of the Chinese Communist government are not less notorious. In the Moon case, we did take judicial notice "of the hazardous conditions" on the China mainland. But we used that fact in a severely limited way, i. e., to give Moon 90 days to cooperate with the Immigration authorities in bringing about his deportation to Formosa. It may well be, then, that we should not feel bound by the Moon case as a precedent.
 
 
 13
 For stare decisis should not govern in a case like this where a man's life is involved. Noteworthy here is Rex v. Taylor (1950) 2 K.B. 368, 371, where the English Court of Criminal Appeals overruled its own recent decision in Rex v. Turner, (1939) 1 All E.R. 330. The Court, after noting that the Court of Appeals in civil suits feels bound by its own earlier decisions as precedents in "order to preserve the rule of stare decisis," went on to say, "This court, however, has to deal with questions involving the liberty of the subject," and therefore felt free to overrule an unfortunate decision which favored the prosecution. Surely that should be the attitude of our courts which are much less bound by their own precedents than English courts have been traditionally. Stare decisis, when it really bites (i. e., when a court reluctantly follows a precedent it deems unwise) finds its basic justification in the policy of not upsetting settled doctrines, no matter how unjust, on which men have importantly relied in the conduct of their affairs.[3] Stare decisis has no bite when it means merely that a court adheres to a precedent it considers correct. It is significant only when a court feels constrained to stick to a former ruling although the Court has come to regard it as unwise or unjust. In such a case, since stare decisis then rests on a sort of estoppel, it should not lead to the perpetuation of injustice when the party who urges the court to abide by the precedent has actually not, before the suit began, changed his position in reliance on it.[4] Even, therefore, in civil cases, courts should heed Lord Wright's comment: "Great judges have said that the function of the common law was the perpetual quest for justice. I should be sorry if quest for certitude were substituted for quest of justice."[5] Especially should that comment guide a court in a case like this when the government cites a precedent embodying an unjust ruling adverse to the appellant. For the government is not in the position of a businessman who has purchased property, or incurred a business risk, in reliance on a judicial precedent. Rather is the government like one who objects to a change in a substantive rule relative to negligence or a procedural rule of evidence or practice; as to such rules, stare decisis has relatively little vigor.
 
 
 14
 3. On the basis of a fact which we know judicially, an administrative determination of the contrary fact is arbitrary and capricious, and therefore administrative action grounded on that finding is outside the administrative discretion conferred by the statute.
 
 
 15
 4. There is also this question: If the officer who made the finding relied upon information in the Department's files to show no danger to relator, should not that information have been put in the administrative record, absent a statement by the officer that he had determined that the disclosure "would be prejudicial to the public interest, safety or security?"[6] See United States v. Abilene & Southern Railway Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; cf. Simon v. U. S., 348 U.S. 967, 75 S.Ct. 531, 99 L.Ed. 753; Bradley v. U. S., 348 U.S. 967, 75 S.Ct. 532, 99 L.Ed. 754.
 
 
 16
 5. After the deportation order was made, and in the habeas corpus proceeding below, an attorney for the Immigration and Naturalization Service filed an affidavit in which he said that recently a "party of Chinese persons" who had been deported to Communist China were not there molested and that the same has been true of many other such persons. Note the vagueness of that statement. Affiant does not say whether those persons were anti-Communists.
 
 
 17
 Moreover, it would here be futile for this court to do what we did in Moon's case, i. e., to give this alien "another opportunity to cooperate with the Immigration authorities in bringing about his deportation to Formosa or any other authority under the control of the Chinese Nationalist Government." For government counsel, on oral argument of this motion, conceded that the Chinese Nationalist Government will not now accept appellant or any other such Chinese, and that no country other than that controlled by the Chinese Communist government will now receive him.
 
 
 18
 6. A statute should, if possible, be so construed as not to be — or to come close to the brink of being — unconstitutional. This statute comes close to that brink, and perhaps goes over it, if interpreted to give the Attorney General, or any of his subordinates, arbitrary power. See Hart, The Power of Congress to Limit, the Jurisdiction of Federal Courts, 66 Harv.L.Rev. (1953) 1362 at 1390, 1393-1394: "Before long * * * (the Supreme Court) began to see * * * that a power to lay down general rules, even if it were plenary, did not necessarily include a power to be arbitrary or to authorize administrative officials to be arbitrary. It saw that, on the contrary, the very existence of a jurisdiction in habeas corpus, coupled with the constitutional guarantee of due process, implied a regime of law. It saw that in such a regime the courts had a responsibility to see that statutory authority was not transgressed, that a reasonable procedure was used in exercising the authority, and — seemingly also — that human beings were not unreasonably subjected, even by direction of Congress, to an uncontrolled official discretion. * * * The . . . Constitution always applies when a court is sitting with jurisdiction in habeas corpus. For then the court has always to inquire, not only whether the statutes have been observed, but whether the petitioner before it has been `deprived of life, liberty, or property, without due process of law,' or injured in any other way in violation of the fundamental law. That is the premise of the deportation cases * * *. That principle forbids a constitutional court with jurisdiction in habeas corpus from ever accepting as an adequate return to the writ the mere statement that what has been done is authorized by act of Congress. The inquiry remains, if Marbury v. Madison still stands, whether the act of Congress is consistent with the fundamental law. Only upon such a principle could the Court reject, as it surely would, a return to the writ which informed it that the applicant for admission lay stretched upon a rack with pins driven in behind his fingernails pursuant to authority duly conferred by statute in order to secure the information necessary to determine his admissibility. The same principle which would justify rejection of this return imposes responsibility to inquire into the adequacy of other returns."
 
 
 19
 7. For the foregoing reasons, I think this appeal presents substantial legal questions. Accordingly, the motion for a stay is granted.
 
 
 20
 8. Appellant also asks that he be permitted to prosecute the appeal on typewritten briefs, and that the original administrative record be handed to the court in lieu of a printed appendix. That motion is granted.
 
 
 21
 9. Appellant further seeks his release on bail pending a decision on the merits by a full panel of the court. Government counsel, on argument before me, stated that the government does not object to releasing the petitioner on bail in the sum of $1,000, if a stay were granted. Accordingly, Fong Foo is to be released on payment of $1,000 bail. The hearing of the appeal is set for argument in the first week of our October term.
 
 
 22
 Motion granted.
 
 
 
 Notes:
 
 
 [1]
 It seems incredible that, in the light of the well-known espionage methods of Communist governments, the Chinese Communist government does not know of appellant's affiliation with the Formosa government
 
 
 [2]
 In the administration of the Displaced Persons Act of 1948, 62 Stat. 1009, 50 U.S.C.A.Appendix, § 1951 et seq., and the Refugee Relief Act of 1953, 67 Stat. 400, 50 U.S.C.A.Appendix, § 1971 et seq., the Attorney General has decided many claims for asylum based on fear of persecution. The question in those cases, as described in an affidavit (filed in opposition to the pending motion) of the attorney for the Immigration and Naturalization Service, is whether the displaced person "has a reasonable basis to fear persecution, whether or not he would actually be persecuted if he returned to his native country." That question is similar to the question in the instant case, for applicants for relief under Section 243(h) of the Immigration and Nationality Act cannot prove more than a "reasonable basis to fear persecution." The many adjudications under the Displaced Persons Acts show that the Attorney General, acting through a different Assistant Commissioner than the one here involved, has frequently granted asylum to Chinese displaced persons based on the alleged anti-Communism of the applicants
 
 
 [3]
 They rely on precedents less often than courts usually assume
 See Cardozo, Growth of the Law (1924) 122: "The picture of the bewildered litigant lured into a course of action by the false light of a decision, only to meet ruin when the light is extinguished and the decision is overruled, is for the most part a figment of excited brains. The only rules there is ever any thought of changing are those that are invoked by injustice after the event to shelter and intrench itself. In the rarest instances, if ever, would conduct have been different if the rule had been known and the change foreseen. At times the change means the imposition of a bill of costs that might otherwise have been saved. That is a cheap price to pay for the uprooting of an ancient wrong."
 See also Gray, The Nature and Sources of Law (1921) p. 100: "Practically, in its application to actual affairs, for most of the laity, the law, except for a few crude notions of the equity involved in some of its general principles, is all ex post facto. When a man marries, or enters into a partnership, or buys a piece of land, or engages in any other transaction, he has the vaguest possible idea of the law governing the situation, and with our complicated system of jurisprudence, it is impossible it should be otherwise. If he delayed to make a contract or do an act until he understood exactly all the legal consequences it involved, the contract would never be made or the act done. Now the law of which a man has no knowledge is the same to him as if it did not exist."
 
 
 [4]
 See Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 298 (concurring opinion); Commissioner of Internal Revenue v. Hall's Estate, 2 Cir., 153 F.2d 172, 175 (dissenting opinion); Frank, Courts on Trial (1949) 268-271
 
 
 [5]
 Wright, The Law of "Invitation", 66 L.Q.Rev. (1950) 454, 456
 
 
 [6]
 See 8 C.F.R. Section 244.3