**UNITED STATES of America ex rel. TOM MAN, also known as Tom Gin Sing, Relator,**

**v.**

**Edward J. SHAUGHNESSY, as District Director of Immigration and Naturalization Service of the United States, Department of Justice, for the District of New York, or such person, if any, who might have said relator in custody, Respondent.**

United States District Court
S. D. New York.
May 16, 1956.

Spar, Schlem & Burroughs, New York City, for relator.

Paul W. Williams, U. S. Atty. for Southern District of New York, New York City, for the United States. Burton S. Sherman, Sp. Asst. U. S. Atty., of counsel.

Roy Babitt, Atty., Immigration & Naturalization Service, New York City, for respondent.

DIMOCK, District Judge.

A writ of habeas corpus has been sued out on behalf of an alien, Tom Man, who is subject to a final order of deportation to the mainland of China.

The relator, 50 years of age, a native and citizen of China, last entered the United States in 1925, as a seaman on an unknown British vessel. After a hearing, relator was found deportable from the United States on the ground that he had remained in this country for a longer period than authorized. Relator concedes the correctness of this finding. After relator failed to avail himself of the privilege of voluntary departure granted to him, he was ordered deported to the mainland of China.

Relator then moved, pursuant to 8 U. S.C. § 1253(h), for a stay of deportation, alleging that he would be subject to physical persecution if forced to return to Communist China. After hearing, this request for a stay was denied. In this petition relator asks that this determination be set aside as an abuse of discretion and arbitrary in view of the evidence.

Both relator and the Government have offered evidence on the question of relator's anti-Communist or pro-Communist tendencies. The Government argues that relator's past membership in the Chinese Hand Laundry Alliance in New York, listed as subversive by the Attorney General, and his past subscription to the China Daily News, a newspaper alleged to be pro-Communist, are sufficient grounds to uphold its determination that relator will not be subject to persecution in Communist China. On the other hand, relator has offered evidence of his membership in anti-Communist organizations, contributions of money to anti-Communist causes, and ownership of bonds of the Nationalist China Government.

He states that he resigned from the Chinese Hand Laundry Alliance as soon as he discovered its pro-Communist leanings and had never been an officer or active member of that organization. As to his subscription to the China Daily News, he states that he read it only to discover "what the other side was doing".

In view of the conclusion I have reached, it is not necessary for me to decide at this time whether the denial of the stay of deportation was an abuse of discretion; that question is not yet before me since the Government has not met the statutory requirements relating to deportation to a foreign country.

Section 1253, of title 8 U.S.C., determines to which country an alien may be deported. The first portion of that section deals with the first choice of the country to which the alien shall be deported:

"(a) The deportation of an alien in the United States provided for in this chapter * * * shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. * * * If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter be disregarded."

Considering this requirement immediately, it is clear that, at his original hearing on November 24, 1953, relator specified Formosa as his preference if he had to leave this country. There is no record in the administrative file of this case nor is there any statement by the Government that an inquiry was addressed to the Nationalist Chinese Government as to its willingness to accept this relator. No doubt the Government would argue that such an inquiry would be an empty gesture in view of the Chinese Nationalist Government's prior statements that it would not accept any Chinese. See United States ex rel. Fong Foo v. Shaughnessy, 2 Cir., 234 F.2d 715 (Judge Frank).

I do not believe such a contention would suffice to avoid the duty placed upon the Attorney General by the statute. No one can be positive that the Chinese Nationalist Government has not changed its position or that it will not make an exception as to this relator.

My opinion in United States ex rel. Scala Di Felice v. Shaughnessy, D.C.S. D.N.Y., 114 F.Supp. 791, is in point. I there stated, at page 795:

"My view would be that a reasonably fair and adequate inquiry should be addressed by the Attorney General to the government of the country designated to determine whether that country will accept the alien. It seems to me that it would be inconsistent with the right afforded the alien by the statute if the Attorney General were free to proceed with deportation to another country without making any inquiry whatsoever * * *."

However, even assuming that the Government had inquired of the Chinese Nationalist Government and had received a negative reply, that would not suffice under the statute to permit deportation to Communist China. If Nationalist China did deny relator admission, other portions of § 1253 would then become applicable. Those portions are as follows:

"Thereupon [upon failure of the designated country to permit entry] deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months

following the date of original inquiry, * * * whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion * * * either—

"(1) to the country from which such alien last entered the United States;

* * * * * *

"(3) to the country in which he was born;

"(4) to the country in which the place of his birth is situated at the time he is ordered deported;

"* * * or

"(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory."

■ In order for an alien to be deported to Communist China pursuant to the above alternatives, the Attorney General must have been advised by the Communist China Government that it would accept the alien. See United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.2d 316, 318.

■ While in most cases it might be presumed that "the country in which he was born" had consented to accept a deportable alien, see United States ex rel. Hudak v. Uhl, D.C.N.D.N.Y., 20 F.Supp. 928, such a presumption, by itself, could not withstand the facts of this case. To begin with, it is arguable that the proposal is not to deport the alien to "the country in which he was born" but to "the country in which the place of his birth is situated at the time he is ordered deported". Moreover, the United States does not recognize the Communist Government in China and has no relations with it. Respondent does not state what method it will use to deliver relator into Communist China. Relator, in his petition, states:

"That in effect, it is the plan of the respondent to obtain a transit certificate or visa for the relator from the British Government enabling the respondent or agents employed by the United States Department of Justice to send relator to Hong Kong, where he will be admitted to that country in transit. That thereafter the appropriate officials of the United States Government will seek to either smuggle or otherwise surreptitiously remove the relator from Hong Kong and send him into the interior of Communist controlled China."

The Government, in its return to relator's petition did not controvert these allegations. If these allegations are true, it is clear that the Government does not intend to obtain the necessary consent of the Communist China Government. But without Communist China's agreement to admit relator, the statute will not permit his deportation to that country. See my recent memorandum in United States ex rel. Hon v. Shaughnessy, D.C.S.D.N.Y., 142 F.Supp. 468.

The writ will be sustained unless the Government, within 30 days from this date, obtains and exhibits to the court and to relator's counsel, official documents permitting the landing of relator in Formosa, or advises the court and relator's counsel that it has made the inquiry of the Nationalist Chinese Government contemplated by section 1253. If the Government receives a negative reply from the Nationalist Chinese Government, the writ will be sustained unless a similar request is made of the Communist Chinese Government within 30 days of the receipt of the reply from the Nationalist Chinese Government. The Government shall advise the court and relator's counsel of such additional inquiry to the Communist Chinese Government.

If the Government succeeds in obtaining official documents permitting the entry of relator into Communist China, I will then consider relator's application under section 1253(h), relating to the possibility of persecution if he returns to Communist China.