CHANG AH DING and Chang Shing
Hwa, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 16272.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1957.

Brown, Circuit Judge, dissented.

Joseph W. Cash and Charles H. Sherman, Jr., Houston, Tex., for appellants.

James E. Ross, Asst. U. S. Atty., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

PER CURIAM.

This is an appeal from an order denying an application for Habeas Corpus. The matter comes up in this way. Seeking relief, not upon the ground that they were not deportable aliens and therefore their custody and detention for deportation to Formosa was basically illegal, but upon the sole ground that the Immigration and Naturalization Service cannot effect their deportation to that country for the reason that "entry permit, passport and travel documents have not been obtained", appellants, relators below, filed applications for Habeas Corpus. A show cause order was issued, directing respondents named to "produce before the court [the persons of the relators] on the 24th day of May, A.D., 1956, then and there to show cause why they should not be restrained and *enjoined from restraining relator of his liberty and deporting relator from the United States to Formosa, without having previously secured proper permission and necessary travel documents from the government of the Island of Formosa.*" (Emphasis supplied.)

The respondent alleging, that relators were being legally detained under the authority of duly issued warrants of deportation attached to their response and, that, under their authority, they are to be deported to Formosa, and denying their claim that the deportation cannot be effected for want of consent from the government of Taiwan, or Formosa, to receive the relators, the matter was set for hearing on the sole claim made, the lack of permission from Formosa.

After a hearing, in which relators made no proof in support of their asserted claim, the district judge, declaring:

"It is clear that they are subject to be deported, and I think it is clear

they should be deported to China. I think it is entirely fitting and proper—this is not a judicial remark but a remark made out of my own judgment—I think it is entirely proper that they be returned on the lines of the China Union Lines, a ship flying the Chinese National flag and the line each of them was working for at the time each deserted his ship, and I am going to rule and rule now, the petitions for habeas corpus are denied and they are ordered dismissed."

entered his order discharging the writs and denying the relators' petitions, and they have appealed under the protection, pending the appeal and its determination, of an order [1] staying their deportation.

Here urging one proposition and insisting that because of the absence of the *administrative file* and the refusal of the court to delay the hearing until the file could be received, appellants, citing cases,[2] urge upon us that the judgment must be reversed and the cause remanded.

The United States, moving to dismiss the appeal as moot, makes formal showing by affidavit and the tender of the documents for inspection that since the filing of the appeal, in addition to the consent to receive appellants, on which the deportation action was taken, the Chinese Nationalist Government of Formosa, or Taiwan, has now caused to be issued and placed in the custody of the officer in charge, Immigration and Naturalization Service at Houston, where they are available for inspection, travel documents or passports for each of the appellants to travel to and land in Formosa. Subject to its motion, it insists, for the reasons carefully set out and upon the authorities cited by it, that the judgment was right and should be affirmed.

The appellant in no manner controverting the showing made, we agree with the United States that the case is moot. Because we do, we should not, indeed we cannot, proceed to a determination of the appeal on its merits but must remand the cause with directions to the district court to vacate its judgment and dismiss the proceeding from the docket on the ground that the cause is moot. Lake Charles Metal Trades Council v. Newport Industries, 5 Cir., 181 F.2d 820 and cases cited; Alton v. Alton, 347 U.S. 610, 74 S.Ct. 736, 98 L.Ed. 987.

Remanded with directions to dismiss as moot.

BROWN, Circuit Judge (dissenting).

Were this case confined to the narrow compass described in the Court's opinion, I would cheerfully join in the dismissal. But, as I see this record, much more took place and Relators wanted even much more than that to take place.

The administrative process having just been completed, the Immigration and Naturalization authorities moving with great dispatch sent these two Chinamen by air to Houston, Texas, for immediate deportation on the SS Union Trader as though, for some reason, it thought this the last slow boat to China. Local counsel in Houston acting as best they could with an insuperable language difficulty that defied any intelligent communication were requested by New York counsel who had acted for these Chinamen in the administrative hearings to institute Habeas Corpus to test the validity of the administrative process.

With the hot breath of the sovereign on their neck, the boilers of the SS Union Trader nearly under a full head of steam ready to break ground on her oriental

1. "An appeal having been filed in the above entitled matter, it is hereby ordered that the respondents herein retain the relators within the jurisdiction of this court and that they be not deported, or removed, from the jurisdiction of this court, during the pendency and until the final determination of said appeal."

2. United States ex rel. Tom Man v. Shaughnessy, D.C., 142 F.Supp. 444; United States ex rel. Fong Foo v. Shaughnessy, 2 Cir., 234 F.2d 715; United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.2d 316, 318; United States ex rel. Lee Ming Hon v. Shaughnessy, D.C., 142 F.Supp. 468.

voyage from Galveston, little time for the niceties of pleading was available to these Chinamen. Looking upon the sacred Writ of Habeas Corpus as something transcending technical limitations, that the pleading itself was a bare skeleton is not, in this atmosphere of urgency, sufficient ground for summary disposition. I would suppose that it, like any other Civil Action, is subject to the Federal Rules and once a hearing is held, pleadings are of little importance. Consequently, what was involved in this awkward and difficult hearing, was not the sole, limited question of whether they would be received by the authorities at Taiwan (Formosa). It soon developed on the extensive presentation by counsel [1] that the real question was whether the administrative record showed any basis for action of the Attorney General in declining to deport these persons (or at least one of them) to the port requested—Hong Kong.

So unusual was this hearing that the Government itself had to confess that it

[1]. The Court, in view of the shortness of time permitted an oral traverse to the Government's answer to the petition and the issues were explored by full colloquy. See, for example:

(R. 40) Mr. Sherman (petitioner's counsel):

"That at such time as their deportation, if effected, the relators wish to designate, one, Hong Kong, British Crown Colony, as the territory to which the United States—that the United States can deport them in accordance with Section 1253, [8 U.S.C.A.] * * *"

(R. 47)

"Mr. Sherman: I think this is what— apparently the New York attorneys nor ourselves nor the Government has any question about the deportability of these men. They are deportable. They would not be permitted to stay.

"The Court: It is a question of where they are to be deported to?

"Mr. Sherman: Yes. Section 1253 under Title 8 provides a method—

"The Court: Do you have it?

"Mr. Sherman: Yes, we do. 1253 in general, may I state, sets up the places to where the Government may deport an individual * * *

(R. 49) Mr. Cash (petitioner's counsel):

"Mr. Cash: Here is my analysis, Your Honor: the history of this 1253 would have to be considered."

(R. 51)

"Mr. Cash: Under the circumstances, we actually ought to be able to more closely examine these two men and to see the Immigration file to see whether or not the Government itself has followed its own rules and regulations in determining where they should be sent."

(R. 53)

" * * * but I don't believe it is the right of the Government to take a seaman * * * to put him back on a ship of that line because Congress has said he has a right of choice. There are six or seven different alternatives but both are Congressional commands based upon hearings and it is really something which, if the Attorney General has acted fairly and followed the law, this Court or no attorney would have jurisdiction to question it."

* * * * *

"The Court: I am looking at Article [section] 1253 and they enumerate various choices which you say they are entitled to, one to the country from which such alien last entered the United States."

(R. 56) The Court reads verbatim from 8 U.S.C.A. § 1253 and, ignoring country of the alien's choice, concentrates with persistent fixation on the country from whence the alien embarked, which leads to speculation as to where seamen, signing aboard as crew members, "embark."

(R. 58)

"Mr. Cash: * * * Congress has put it in the hands of the Attorney General. I believe it boils down to the necessity of more facts as to what the history of these men was before they got into the country for enough of a period to satisfy the Court as to whether or not the Attorney General has committed an error of law in designating * * * the place of final deportation * * *"

The Government's response to this indicates that § 1253 was the statutory standard for administrative action:

(R. 61) Mr. Ross (Government's counsel):

" * * * Section 1253 of Title 8 says that the Attorney General shall allow the alien to choose a place where he wants to go unless the Attorney General in his discretion concludes that deportation to such country would be prejudicial of the interest of the United States. It may be those in charge of the deportation proceedings in New York have decided in their discretion it is prejudicial to the interests of the United States for these men to be sent to Hong Kong. * * *"

had not had time to prepare an adequate response and a short adjournment was allowed for that purpose. In the course of the extended colloquy, the District Attorney affirmed that substantial issues were at stake by candidly stating that at one stage they were almost persuaded that the Writ sought should be granted.

The record shows that these two Chinamen speak Shanghai dialect, and only after the greatest difficulty was any interpreter capable of interpreting any of their words finally found. According to him, neither of them spoke the same dialect as he (Cantonese), and oral communication, if not impossible, was, for a judicial proceeding, at least patently untrustworthy. At one stage an effort was used to employ written Chinese ideographs, i. e., characters, to ascertain such facts as the port at which they shipped aboard their respective vessels as seamen, the ports to which they wanted to be deported, and the ports requested by them as the port of deportation.

All the while the clock was ticking by, the Court was visibly apprehensive that something had to be done—that under no circumstances could his decision await the departure of this vessel. The Relators through their local counsel made persistent efforts to have the Court adjourn the hearing until the administrative record—the sole basis on which review could be had—could arrive in Houston. It had been requested and was en route by air mail at the very moment.

These ignorant strangers in a foreign tribunal, in an alien atmosphere, are now criticized by Government counsel for having made no proof in support of their asserted claim. The record shows repeatedly that their counsel requested vigorously that the administrative record be made available so that the Court could determine, on that record, whether the Attorney General had fairly and adequately complied with the law. That was the only proof that could be made. It was the only proof they sought to make.

As a matter of fact, the reading of the whole record shows that haste was the real vice of this whole proceeding. It robbed Court and counsel of that time essential to an orderly presentation of serious contentions affecting the present liberty (and perhaps the life) of two people. From the informal findings stated by the Court and quoted in our opinion, it is now perfectly plain and the Government makes no attempt to defend it, that the District Judge was laboring under an irrelevant impression[2] that these two Chinese former seamen were somehow seeking some greater advantage than they would have had had they remained aboard their respective ships, so that, if they were to be sent to Formosa, it was their, not our, fault. These considerations were not only without record support, they were wholly irrelevant. To this day this record shows nothing except that these men were being deported as former seamen. One can have that status without having committed any acts involving wrong in the usual sense. See, e. g., 8 U.S.C.A. § 1282(a).

Two counsel, members of the Bar of the District Court, with time and an impending order of deportation so short,

2. See, e. g., these comments by the Court: (R. 48) "It appears that one of them deserted his ship in Savannah, Georgia, and the other deserted his ship in Baltimore, Maryland. They are in court now. They say through their counsel that they wish to designate Hong Kong, a British Crown Colony, as the place to which they should be deported. Now, I don't think they have any greater right, I don't think they have any better selection of choice now than they had before they deserted their ship. If there is a ship of the China Union Lines in port, it seems to me the reasonable and just thing to do is to return them to that company which was their employer to put them back exactly where they were. I don't think it rests with the United States Court to say this man, who is not an American, should be delivered to a particular country of his choice. I don't think it is our business to be telling China where a Chinaman should be settled. * * *" (R. 59) "That may not be the law, but I don't think the men gain that right by deserting a ship. I will speak right out. * * * I don't think one should enrich or better himself by desertion."

made crystal clear the contention brought forward in the briefs [3] here that there was no adequate showing that the Attorney General had any basis for declining to deport them to the Port of Hong Kong as requested under Section 1253. To this day that issue has never been answered. The only way it can be answered on this record by a dismissal as moot is for this Court to hold that when Congress says that "deportation shall be directed by the Attorney General *within his discretion*," it means that he need not have any reason or may have a bad one. Conceding that the widest latitude is necessarily invested in the Attorney General in dealing with aliens, this nation, for very wise reasons, has always taken steps that these strangers on our soil not be the victims of the bureaucratic absolutism in which they may have been reared, and that when law imposes upon an administrative official the obligation to use "discretion,"[4] it means at least a reasoned, honest good faith judgment having some reasonable support. Judge, now Mr. Justice, Harlan makes this clear, United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.2d 316, 318: "This is not to say that the courts may not intervene when an alien has been denied appropriate procedural due process or a fair consideration of his application."

Habeas Corpus, if not the only remedy, cf. Heikkila v. Barber, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972; Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868, was certainly available and suitable to test the validity of the restraint and detention. But a petition for Habeas Corpus, when thus used, is intended to precipitate something more than the mere display by the detaining officer of the writ, warrant or order by which the relator is held. If it ever had that limited scope it has, and should have, long lost it. Today it is the mechanism by which legality is tested.

And to this must now be inserted the fresh decision, Brownell v. Tom We Shung, 77 S.Ct. 252, which makes crystal clear that the spirit of the Administrative Procedure Act requires a judicial review by suitable form of these actions of the Attorney General under the Immigration Act even though the Act describes them as "final" or within his "discretion."

The disposition of this case saps the precious Writ of Habeas Corpus of much of its vitality. It makes a fetish out of formal pleadings in an era when they are no longer of any consequence and, on the Relator's obligation to go forward to show an invalid detention, it judges this as though the matter was for determination upon evidence to be offered by witnesses rather than upon the sufficiency of the administrative record which was yet in the sole custody of the United States Government. If the record were not there, these Chinamen could do nothing about that. Their only remedy was to request its production.

A hearing was never held for the Judge closed eyes and ears to the only thing of consequence.

---

3. Specifications of Error in appellants' brief:
"The Court erred in:
"(a) Proceeding to judgment without requiring the production of the Administrative Immigration file of the Department of Justice;
\* \* \* \* \*
"(c) Proceeding to trial and judgment in ordering the deportation of the aliens without safeguarding their statutory right to be deported to a place designated by the aliens."

4. That "Discretion," a key word in the sweeping reforms of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. and one commonly employed in administrative legislation is not understood by Congress to mean unreviewable, irresponsible bureaucratic license is convincingly demonstrated by the history of that Act. See Amarillo-Borger Express v. United States, D.C.N.D.Tex., 138 F.Supp. 411, at page 418 note 13, three judge court; Dixie Carriers v. United States, D.C.S.D.Tex., 143 F.Supp. 844, 851 note 12(d), three judge court.

I think the Great Government of the United States had time to assure that hearing.

I would reverse to obtain that.

I dissent.